AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
District of Utah

FILED IN UNITED STATES DISTRICT
COURT, DISTRICT OF UTAH
MAR 27 2014
D. MARK JONES, CLERK
BY_____
DEPUTY CLERK

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )   Case No. 2:14-mj-76 PMW
See Attachment A )
)
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A

located in the ____Central____ District of ____Utah____, there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § §1591,1594 See attached Affidavit | Offenses involving the sexual exploitation of persons; See attached Affidavit |

The application is based on these facts:
See attached Affadavit in Support of Search Warrant, incorporated herein by reference

☐ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Applicant's signature

Todd Palmer, FBI Special Agent
Printed name and title

Sworn to before me and signed in my presence.

Date: 27 March 2014

_____
Judge's signature

City and state: SLC, UTAH

PAUL M. WARNER, United States Magistrate Judge
Printed name and title

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF 1 CELLULAR TELEPHONE AS DESCRIBED IN ATTACHMENT A, CURRENTLY LOCATED IN FBI EVIDENCE, 5425 AMELIA EARHART DRIVE, SALT LAKE CITY, UTAH 84116 | Case No. _____ |

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, Special Agent Todd Palmer, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property described in Attachment A, which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. Your affiant has been employed as a Special Agent of the FBI since October 1998, and is currently assigned to the Salt Lake City Field Office's Public Corruption/Civil Rights program. Since joining the FBI, I have investigated numerous federal violations to include bank robberies, kidnappings, homicides, narcotics, gangs, sex trafficking, public corruption and civil rights. Your affiant has been involved in writing Title III affidavits writing and executing search warrants, undercover operations, interviewing victims, interviewing suspects and conducting arrests.

3. As a federal agent, your affiant is authorized to investigate violations of laws of the United States and is a law enforcement officer with the authority to execute warrants issued under the authority of the United States.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

4. The property to be searched is 1 cellular telephone as described in Attachment A hereinafter the "Devices." The Devices are currently located in the FBI's Evidence Room located at 5425 West Amelia Earhart Drive, Salt Lake City, Utah 84116.

5. The applied-for warrant would authorize the forensic examination of the devices listed in Attachment A for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

6. Your affiant, the Federal Bureau of Investigations, and the Salt Lake City Police Department are currently investigating a case of human trafficking.

7. Your affiant is investigating this case along with SLCPD Detective Elizabeth Jacquez. Det. Jacquez either interviewed or reviewed reports regarding N.N and C.H., Det. Jacquez relates to your affiant the following story:

8. On July 20, 2011, in Salt Lake City, Utah, ONTARIO D. LOWERY (LOWERY), arranged for N.N. and C.H. to work for defendants as prostitutes in Salt Lake City, whereby LOWERY had N.N. place internet ads for prostitution. LOWERY kept the money that N.N and the C.H. earned from prostitution. On several occasions a close associate of LOWERY, Mary

2

Ann Person (PERSON) would place their ads and gather information about each city they traveled to.

9. N.N. initially met LOWERY in Rockport, IL (exact date unknown). She met with LOWERY and another unknown female. LOWERY asked N.N., under false pretenses, to go with them for the weekend. When they were out of town, LOWERY stopped at a truck stop and instructed and arranged for N.N. to engage in an act of prostitution. LOWERY took all the money.

10. Between Mid-January 2011 to July 20, 2011, LOWERY and others known and unknown to the Grand Jury operated an online escort service and would receive calls via internet ads for acts of prostitution. During this period of time LOWERY drove N.N. from Illinois to Des Moines, IA, then to Cedar Rapid, IA, before returning to Davenport, IA. From there they traveled to Des Moines, IA, and then to Omaha, NE. They traveled between Omaha, NE, and Des Moines, IA, for a few weeks before returning to Cedar Rapids, IA. N.N. and LOWERY were arrested in Cedar Rapids, IA, for engaging in acts of prostitution. They were picked up by "Amber" and taken to Des Moines, IA. N.N. indicated they traveled to Wisconsin, Illinois, Nebraska, Nevada, Colorado and Utah.

11. N.N. and C.H., traveled with LOWERY to LaCrosse, WI, to engage in acts of prostitution. N.N., another woman and LOWERY returned to Des Moines, IA. From Des Moines, IA, they traveled to Denver, CO, Salt Lake City, UT, Sacramento, CA, and back to Salt Lake City, UT, where N.N. and C.H. were all arrested on July 20, 2011 for engaging in acts of prostitution. LOWERY was not present during the arrest, however based on the interviews of N.N. and C.H., an arrest warrant was issued for LOWERY.

3

12. On July 20, 2011, N.N. and C.H. both stated they were having sex with men for money. They were doing this in every aforementioned city. All the money they were making was going to LOWERY. N.N. attempted to leave and LOWERY assaulted N.N. which left N.N. with a black eye. This assault took place in Denver, CO. N.N. explained she had been arguing with LOWERY about leaving. LOWERY became angry and threatening. N.N. tried to run out of the hotel room, LOWERY grabbed her, slapped her then punched her in the face causing the black eye. After the incident in Denver, CO., LOWERY took N.N.'s identification. LOWERY would not let her leave; he slept with the car keys, money and her identification in a pillow case. He made her sleep with him so she could not leave.

13. Upon arriving in Salt Lake City, Utah on or before July 20, 2011, LOWERY had N.N. and PESON, who was in LaCrosse, Wisconsin, place internet ads featuring N.N. and C.H. for acts of prostitution. LOWERY would call or text PERSON on her cell phone and also would communicate via FACEBOOK. Both N.N. and C.H. would receive phone calls on a cell phone and would arrange the sex acts for hire. The earnings from the sex acts went directly to LOWERY. LOWERY provided hotel rooms, transportation, food and clothing to the women.

14. On October 17, 2013 your affiant received a call from patrol officers stating that a female, B.B., was involved in a sex trafficking ring with LOWERY. LOWERY had two other girls with him, K.L. and Alyssa Turtenwald (TURTENWALD). B.B. informed responding officers LOWERY had posted ads of her on back page and he was manipulating her to have sex or perform sex acts for money. Lowery would then take possession of the money that K.L., TURTENWALD and B.B. made.

15. During an interview with K.L., she confirmed she was using the Backpage ads in order to make money by having sex with customers. K.L. stated that all of money she earned from prostitution was then taken by or given to LOWERY.

16. During the interview with K.L., she stated PERSON would place many of the advertisements and she would gather information about good locations to set up their sex trade business. K.L. also stated that PERSON would communicate via cell phone and through Facebook frequently. Due to your affiants training and experience, your affiant has observed people who recruit girls for prostitution will sometimes use private messaging over Facebook. PERSON was seen as an "information getter" by K.L. and she used Facebook and other forms of social media including email and cellular telephone as a way to keep in contact with the girls that worked for LOWERY.

17. LOWERY has been booked into the Salt Lake County Jail for Human Trafficking relating to the case that your affiant is investigating. While he was in jail, LOWERY made several phone calls to PERSON, which were reviewed by your affiant. The telephone number that LOWERY called one time, which wasn't answered, was 608-397-5547. This number was attributed to PERSON through previous arrests, jail calls, computer searches and internet postings. Subsequent review of jails calls indicated LOWERY had instructed PERSON to obtain a local number so the telephone calls would not cost so much due to long distance toll charges. PERSON obtained the number 801-414-9206 for the purpose of communicating with LOWERY.

18. LOWERY asked PERSON to conduct research using Facebook, he asked PERSON to look up B.B. LOWERY also asked PERSON to do research and to reach out to other individuals with the use of Facebook. LOWERY told PERSON to ask other people over

5

Facebook to friend B.B. so that they could watch what she was doing on Facebook. These conversations between LOWERY and PERSON leads your affiant to believe PERSON uses Facebook and other forms of social media frequently while aiding LOWERY in his crimes of human trafficking.

19.     During jail phone call conversations listened to by your affiant, LOWERY asks PERSON to pull photographs off of Facebook and her computer and send them to him in jail. LOWERY stated to her that he was a celebrity in the jail and wanted to show some of his cell mates his girls. Through training and experience your affiant believes PERSON was sending him photos of girls that were being "pimped out" by LOWERY. Through the conversation your affiant reviewed of recorded jail phone calls your affiant believes PERSON will have these photos on her Facebook and/or cellular telephone.

20.     PERSON was indicted by a Utah Grand Jury on 02/19/2014 and was arrested in LaCrosse, Wisconsin on 02/26/2014. At the time of her arrest she was found with a Samsung SPH-M270 cellular telephone which has the associated telephone number of 608-397-5547. This same phone number is the number LOWERY called once from the Salt Lake County Jail. Through other jail calls and review of PERSON's Facebook account, this is the same number she provides to others as her main contact number.

21.     A Google search of the number 608-397-5547, indicated the number was used to place advertisements on sexually oriented websites. These advertisements have since been deleted. However, it appears Person's number was used to post advertisements on the following websites: escortphonesearch.com; escortads.xxx; www.myproviderguide.com; marksearch.info; and www.escort-boards.com.

6

22. An analysis of dates associated with PERSON indicated PERSON had a cellular telephone with the number 608-397-5547 during the same time the aforementioned advertisements were posted.

## TECHNICAL TERMS

23. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

d. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed

properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

e. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

24. Based on my training, experience, and research I know that the Devices mentioned in Attachment A have the capabilities that allow it to serve as taking digital photos, of then uploading those photos in electronic format that can then be uploaded and then posted via the laptop computer onto the Internet. I also know that the cell phones described in Attachment A have the capabilities of making and receiving telephones. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

25. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

26.  There is probable cause to believe that things that were once stored on the Device may still be stored there, for at least the following reasons:

   a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

   b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

   c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is

typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

27. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

11

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f. I know that when an individual uses an electronic device to obtain access to the Internet, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for

evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

28.  *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant, including imaging the entire device.

29.  *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

30.  I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the devices as described in Attachment A to seek the items described in Attachment B.

## REQUEST FOR SEALING

31.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

TODD PALMER
SPECIAL AGENT
FEDERAL BUREAU of INVESTIGATION

Subscribed and sworn to before me
On March 27, 2014

PAUL M. WARNER
UNITED STATES MAGISTRATE JUDGE

# **ATTACHMENT A**

The property to be searched is described as follows:

**1-**   (1) -   SAMSUNG SPH-M270 Cellular telephone bearing the numbers: DEC 268 435 462 903 635 328 and HEX A00 000 453 778 80 in the battery compartment. The phone is black in color. CURRENTLY LOCATED IN FBI EVIDENCE, 5425 AMELIA EARHART DRIVE, SALT LAKE CITY, UTAH 84116

**2-**

This warrant authorizes the forensic examination of the above listed device for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1. All records on the Device described in Attachment A that relate to violations of Title 18 U.S.C. 1589 and involve Ontario Lowery, Mary Ann Person and Alyssa Turtenwald including:

   a. Photos, advertisements, communications including emails, texts, telephone calls or other electronic communications relating to prostitution;

   b. lists of customers and related identifying information;

   c. information regarding dates or meetings set up with potential customers interested in exchanging sexual acts for money or other compensation;

   d. any information related to prostitution (including names, addresses, phone numbers, or any other identifying information);

   e. any information recording the schedule or travel recent travel by Ontario Lowery and his female companions;;

   f. all bank records, checks, credit card bills, account information, and other financial records.

   g. Any information related to the prostitution or human trafficking scheme involving Ontario Lowery and those under the direction of Lowery.

2. Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3. Records evidencing the use of the Internet Protocol address that was accessed by either the laptop computer of any of the cellular telephones listed in Attachment A, including:

    a. records of Internet Protocol addresses used;

    b. records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.